(Slip Opinion) OCTOBER TERM, 2007 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## SNYDER *v*. LOUISIANA

### CERTIORARI TO THE SUPREME COURT OF LOUISIANA

No. 06–10119.   Argued December 4, 2007—Decided March 19, 2008

During *voir dire* in petitioner's capital murder case, the prosecutor used peremptory strikes to eliminate black prospective jurors who had survived challenges for cause. The jury convicted petitioner and sentenced him to death. Both on direct appeal and on remand in light of *Miller-El* v. *Dretke*, 545 U. S. 231, the Louisiana Supreme Court rejected petitioner's claim that the prosecution's peremptory strikes of certain prospective jurors, including Mr. Brooks, were based on race, in violation of *Batson* v. *Kentucky*, 476 U. S. 79.

*Held:* The trial judge committed clear error in rejecting the *Batson* objection to the strike of Mr. Brooks. Pp. 3–13.

   (a) Under *Batson*'s three-step process for adjudicating claims such as petitioner's, (1) a defendant must make a prima facie showing that the challenge was based on race; (2) if so, "'the prosecution must offer a race-neutral basis for striking the juror in question'"; and (3) "'in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.'" *Miller-El*, *supra,* at 277 (THOMAS, J., dissenting) (quoting *Miller-El* v. *Cockrell,* 537 U. S. 322, 328–329). Unless it is clearly erroneous, the trial court's ruling must be sustained on appeal. The trial court's role is pivotal, for it must evaluate the demeanor of the prosecutor exercising the challenge and the juror being excluded. Pp. 3–4.

   (b) While all of the circumstances bearing on the racial-animosity issue must be consulted in considering a *Batson* objection or reviewing a ruling claimed to be a *Batson* error, the explanation given for striking Mr. Brooks, a college senior attempting to fulfill his student-teaching obligation, is insufficient by itself and suffices for a *Batson* error determination. Pp. 4–13.

      (1) It cannot be presumed that the trial court credited the prosecution's first race-neutral reason, that Mr. Brooks looked nervous.

Deference is owed to a trial judge's finding that an attorney credibly relied on demeanor in exercising a strike, but here, the trial judge simply allowed the challenge without explanation. Since Mr. Brooks was not challenged until the day after he was questioned and thus after dozens of other jurors had been called, the judge might not have recalled his demeanor. Or he may have found such consideration unnecessary, instead basing his ruling on the second proffered reason for the strike. P. 6.

(2) That reason—Mr. Brooks' student-teaching obligation—fails even under the highly deferential standard of review applicable here. Mr. Brooks was 1 of more than 50 venire members expressing concern that jury service or sequestration would interfere with work, school, family, or other obligations. Although he was initially concerned about making up lost teaching time, he expressed no further concern once a law clerk reported that the school's dean would work with Mr. Brooks if he missed time for a trial that week, and the prosecutor did not question him more deeply about the matter. The proffered reason must be evaluated in light of the circumstances that the colloquy and law clerk report took place on Tuesday, the prosecution struck Mr. Brooks on Wednesday, the trial's guilt phase ended on Thursday, and its penalty phase ended on Friday. The prosecutor's scenario—that Mr. Brooks would have been inclined to find petitioner guilty of a lesser included offense to obviate the need for a penalty phase—is both highly speculative and unlikely. Mr. Brooks would be in a position to shorten the trial only if most or all of the jurors had favored a lesser verdict. Perhaps most telling, the trial's brevity, which the prosecutor anticipated on the record during *voir dire,* meant that jury service would not have seriously interfered with Mr. Brooks' ability to complete his student teaching. The dean offered to work with him, and the trial occurred relatively early in the fall term, giving Mr. Brooks several weeks to make up the time. The implausibility of the prosecutor's explanation is reinforced by his acceptance of white jurors who disclosed conflicting obligations that appear to have been at least as serious as Mr. Brooks'. Under *Batson*'s third stage, the prosecution's pretextual explanation gives rise to an inference of discriminatory intent. There is no need to decide here whether, in *Batson* cases, once a discriminatory intent is shown to be a motivating factor, the burden shifts to the prosecution to show that the discriminatory factor was not determinative. It is enough to recognize that a peremptory strike shown to have been motivated in substantial part by discriminatory intent could not be sustained based on any lesser showing by the prosecution. The record here does not show that the prosecution would have pre-emptively challenged Mr. Brooks based on his nervousness alone, and there is no

realistic possibility that the subtle question of causation could be profitably explored further on remand more than a decade after petitioner's trial.  Pp. 6–13.

942 So. 2d 484, reversed and remanded.

ALITO, J., delivered the opinion of the Court, in which ROBERTS, C. J., and STEVENS, KENNEDY, SOUTER, GINSBURG, and BREYER, JJ., joined. THOMAS, J., filed a dissenting opinion, in which SCALIA, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

——————

No. 06–10119

——————

## ALLEN SNYDER, PETITIONER *v.* LOUISIANA

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
LOUISIANA

[March 19, 2008]

JUSTICE ALITO delivered the opinion of the Court.

Petitioner Allen Snyder was convicted of first-degree murder in a Louisiana court and was sentenced to death. He asks us to review a decision of the Louisiana Supreme Court rejecting his claim that the prosecution exercised some of its peremptory jury challenges based on race, in violation of *Batson* v. *Kentucky*, 476 U. S. 79 (1986). We hold that the trial court committed clear error in its ruling on a *Batson* objection, and we therefore reverse.

I

The crime for which petitioner was convicted occurred in August 1995. At that time, petitioner and his wife, Mary, had separated. On August 15, they discussed the possibility of reconciliation, and Mary agreed to meet with petitioner the next day. That night, Mary went on a date with Howard Wilson. During the evening, petitioner repeatedly attempted to page Mary, but she did not respond. At approximately 1:30 a.m. on August 16, Wilson drove up to the home of Mary's mother to drop Mary off. Petitioner was waiting at the scene armed with a knife. He opened the driver's side door of Wilson's car and repeatedly stabbed the occupants, killing Wilson and wounding Mary.

The State charged petitioner with first-degree murder and sought the death penalty based on the aggravating circumstance that petitioner had knowingly created a risk of death or great bodily harm to more than one person. See La. Code Crim. Proc. Ann., Art. 905.4(A)(4) (West Supp. 2008).

*Voir dire* began on Tuesday, August 27, 1996, and proceeded as follows. During the first phase, the trial court screened the panel to identify jurors who did not meet Louisiana's requirements for jury service or claimed that service on the jury or sequestration for the duration of the trial would result in extreme hardship. More than 50 prospective jurors reported that they had work, family, or other commitments that would interfere with jury service. In each of those instances, the nature of the conflicting commitments was explored, and some of these jurors were dismissed. App. 58–164.

In the next phase, the court randomly selected panels of 13 potential jurors for further questioning. *Id.,* at 166–167. The defense and prosecution addressed each panel and questioned the jurors both as a group and individually. At the conclusion of this questioning, the court ruled on challenges for cause. Then, the prosecution and the defense were given the opportunity to use peremptory challenges (each side had 12) to remove remaining jurors. The court continued this process of calling 13-person panels until the jury was filled. In accordance with Louisiana law, the parties were permitted to exercise "backstrikes." That is, they were allowed to use their peremptories up until the time when the final jury was sworn and thus were permitted to strike jurors whom they had initially accepted when the jurors' panels were called. See La. Code Crim. Proc. Ann., Art. 795(b)(1); *State* v. *Taylor*, 93–2201, pp. 22–23 (La. 2/28/96), 669 So. 2d 364, 376.

Eighty-five prospective jurors were questioned as members of a panel. Thirty-six of these survived challenges for

cause; 5 of the 36 were black (as is petitioner); and all 5 of the prospective black jurors were eliminated by the prosecution through the use of peremptory strikes. The jury found petitioner guilty of first-degree murder and determined that he should receive the death penalty.

On direct appeal, the Louisiana Supreme Court conditionally affirmed petitioner's conviction. The court rejected petitioner's *Batson* claim but remanded the case for a *nunc pro tunc* determination of petitioner's competency to stand trial. *State* v. *Snyder,* 98–1078 (La. 4/14/99), 750 So. 2d 832. Two justices dissented and would have found a *Batson* violation. See *id.,* at 866 (Johnson, J., dissenting), 863 (Lemmon, J., concurring in part and dissenting in part).

On remand, the trial court found that petitioner had been competent to stand trial, and the Louisiana Supreme Court affirmed that determination. *State* v. *Snyder,* 1998–1078 (La. 4/14/04), 874 So. 2d 739. Petitioner petitioned this Court for a writ of certiorari, and while his petition was pending, this Court decided *Miller-El* v. *Dretke*, 545 U. S. 231 (2005). We then granted the petition, vacated the judgment, and remanded the case to the Louisiana Supreme Court for further consideration in light of *Miller-El.* See *Snyder* v. *Louisiana*, 545 U. S. 1137 (2005). On remand, the Louisiana Supreme Court again rejected Snyder's *Batson* claim, this time by a vote of 4 to 3. See 1998–1078 (La. 9/6/06), 942 So. 2d 484. We again granted certiorari, 551 U. S. ___ (2007), and now reverse.

## II

*Batson* provides a three-step process for a trial court to use in adjudicating a claim that a peremptory challenge was based on race:

> "'First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race[; s]econd, if that showing has been made,

the prosecution must offer a race-neutral basis for striking the juror in question[; and t]hird, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.'" *Miller-El* v. *Dretke*, *supra,* at 277 (THOMAS, J., dissenting) (quoting *Miller-El* v. *Cockrell*, 537 U. S. 322, 328–329 (2003)).

On appeal, a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous. See *Hernandez* v. *New York*, 500 U. S. 352, 369 (1991) (plurality opinion); *id.*, at 372 (O'Connor, J., joined by SCALIA, J., concurring in judgment). The trial court has a pivotal role in evaluating *Batson* claims. Step three of the *Batson* inquiry involves an evaluation of the prosecutor's credibility, see 476 U. S., at 98, n. 21, and "the best evidence [of discriminatory intent] often will be the demeanor of the attorney who exercises the challenge," *Hernandez*, 500 U. S., at 365 (plurality opinion). In addition, race-neutral reasons for peremptory challenges often invoke a juror's demeanor (*e.g.*, nervousness, inattention), making the trial court's first-hand observations of even greater importance. In this situation, the trial court must evaluate not only whether the prosecutor's demeanor belies a discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor. We have recognized that these determinations of credibility and demeanor lie "'peculiarly within a trial judge's province,'" *ibid.* (quoting *Wainwright* v. *Witt*, 469 U. S. 412, 428 (1985)), and we have stated that "in the absence of exceptional circumstances, we would defer to [the trial court]." 500 U. S., at 366.

## III

Petitioner centers his *Batson* claim on the prosecution's strikes of two black jurors, Jeffrey Brooks and Elaine

Scott. Because we find that the trial court committed clear error in overruling petitioner's *Batson* objection with respect to Mr. Brooks, we have no need to consider petitioner's claim regarding Ms. Scott. See, *e.g., United States* v. *Vasquez-Lopez*, 22 F. 3d 900, 902 (CA9 1994) ("[T]he Constitution forbids striking even a single prospective juror for a discriminatory purpose"); *United States* v. *Lane,* 866 F. 2d 103, 105 (CA4 1989); *United States* v. *Clemons,* 843 F. 2d 741, 747 (CA3 1988); *United States* v. *Battle*, 836 F. 2d 1084, 1086 (CA8 1987); *United States* v. *David*, 803 F. 2d 1567, 1571 (CA11 1986).

In *Miller-El* v. *Dretke*, the Court made it clear that in considering a *Batson* objection, or in reviewing a ruling claimed to be *Batson* error, all of the circumstances that bear upon the issue of racial animosity must be consulted. 545 U. S., at 239. Here, as just one example, if there were persisting doubts as to the outcome, a court would be required to consider the strike of Ms. Scott for the bearing it might have upon the strike of Mr. Brooks. In this case, however, the explanation given for the strike of Mr. Brooks is by itself unconvincing and suffices for the determination that there was *Batson* error.

When defense counsel made a *Batson* objection concerning the strike of Mr. Brooks, a college senior who was attempting to fulfill his student-teaching obligation, the prosecution offered two race-neutral reasons for the strike. The prosecutor explained:

"I thought about it last night. Number 1, the main reason is that he looked very nervous to me throughout the questioning. Number 2, he's one of the fellows that came up at the beginning [of *voir dire*] and said he was going to miss class. He's a student teacher. My main concern is for that reason, that being that he might, to go home quickly, come back with guilty of a lesser verdict so there wouldn't be a penalty phase.

Those are my two reasons." App. 444.

Defense counsel disputed both explanations, *id.,* at 444–445, and the trial judge ruled as follows: "All right. I'm going to allow the challenge. I'm going to allow the challenge." *Id.,* at 445. We discuss the prosecution's two proffered grounds for striking Mr. Brooks in turn.

A

With respect to the first reason, the Louisiana Supreme Court was correct that "nervousness cannot be shown from a cold transcript, which is why . . . the [trial] judge's evaluation must be given much deference." 942 So. 2d, at 496. As noted above, deference is especially appropriate where a trial judge has made a finding that an attorney credibly relied on demeanor in exercising a strike. Here, however, the record does not show that the trial judge actually made a determination concerning Mr. Brooks' demeanor. The trial judge was given two explanations for the strike. Rather than making a specific finding on the record concerning Mr. Brooks' demeanor, the trial judge simply allowed the challenge without explanation. It is possible that the judge did not have any impression one way or the other concerning Mr. Brooks' demeanor. Mr. Brooks was not challenged until the day after he was questioned, and by that time dozens of other jurors had been questioned. Thus, the trial judge may not have recalled Mr. Brooks' demeanor. Or, the trial judge may have found it unnecessary to consider Mr. Brooks' demeanor, instead basing his ruling completely on the second proffered justification for the strike. For these reasons, we cannot presume that the trial judge credited the prosecutor's assertion that Mr. Brooks was nervous.

B

The second reason proffered for the strike of Mr. Brooks—his student-teaching obligation—fails even under

the highly deferential standard of review that is applicable here. At the beginning of *voir dire*, when the trial court asked the members of the venire whether jury service or sequestration would pose an extreme hardship, Mr. Brooks was 1 of more than 50 members of the venire who expressed concern that jury service or sequestration would interfere with work, school, family, or other obligations.

When Mr. Brooks came forward, the following exchange took place:

> "MR. JEFFREY BROOKS: . . . I'm a student at Southern University, New Orleans. This is my last semester. My major requires me to student teach, and today I've already missed a half a day. That is part of my—it's required for me to graduate this semester.
>
> "[DEFENSE COUNSEL]: Mr. Brooks, if you—how many days would you miss if you were sequestered on this jury? Do you teach every day?
>
> "MR. JEFFREY BROOKS: Five days a week.
>
> "[DEFENSE COUNSEL]: Five days a week.
>
> "MR. JEFFREY BROOKS: And it's 8:30 through 3:00.
>
> "[DEFENSE COUNSEL]: If you missed this week, is there any way that you could make it up this semester?
>
> "MR. JEFFREY BROOKS: Well, the first two weeks I observe, the remaining I begin teaching, so there is something I'm missing right now that will better me towards my teaching career.
>
> "[DEFENSE COUNSEL]: Is there any way that you could make up the observed observation *[sic]* that you're missing today, at another time?
>
> "MR. JEFFREY BROOKS: It may be possible, I'm not sure.
>
> "[DEFENSE COUNSEL]: Okay. So that—

"THE COURT: Is there anyone we could call, like a Dean or anything, that we could speak to?

"MR. JEFFREY BROOKS: Actually, I spoke to my Dean, Doctor Tillman, who's at the university probably right now.

"THE COURT: All right.

"MR. JEFFREY BROOKS: Would you like to speak to him?

"THE COURT: Yeah.

"MR. JEFFREY BROOKS: I don't have his card on me.

"THE COURT: Why don't you give [a law clerk] his number, give [a law clerk] his name and we'll call him and we'll see what we can do.

"(MR. JEFFREY BROOKS LEFT THE BENCH)." App. 102–104.

Shortly thereafter, the court again spoke with Mr. Brooks:

"THE LAW CLERK: Jeffrey Brooks, the requirement for his teaching is a three hundred clock hour observation. Doctor Tillman at Southern University said that as long as it's just this week, he doesn't see that it would cause a problem with Mr. Brooks completing his observation time within this semester.

"(MR. BROOKS APPROACHED THE BENCH)

"THE COURT: We talked to Doctor Tillman and he says he doesn't see a problem as long as it's just this week, you know, he'll work with you on it. Okay?

"MR. JEFFREY BROOKS: Okay.

"(MR. JEFFREY BROOKS LEFT THE BENCH)." *Id.,* at 116.

Once Mr. Brooks heard the law clerk's report about the conversation with Doctor Tillman, Mr. Brooks did not express any further concern about serving on the jury, and the prosecution did not choose to question him more

deeply about this matter.

The colloquy with Mr. Brooks and the law clerk's report took place on Tuesday, August 27; the prosecution struck Mr. Brooks the following day, Wednesday, August 28; the guilt phase of petitioner's trial ended the next day, Thursday, August 29; and the penalty phase was completed by the end of the week, on Friday, August 30.

The prosecutor's second proffered reason for striking Mr. Brooks must be evaluated in light of these circumstances. The prosecutor claimed to be apprehensive that Mr. Brooks, in order to minimize the student-teaching hours missed during jury service, might have been motivated to find petitioner guilty, not of first-degree murder, but of a lesser included offense because this would obviate the need for a penalty phase proceeding. But this scenario was highly speculative. Even if Mr. Brooks had favored a quick resolution, that would not have necessarily led him to reject a finding of first-degree murder. If the majority of jurors had initially favored a finding of first-degree murder, Mr. Brooks' purported inclination might have led him to agree in order to speed the deliberations. Only if all or most of the other jurors had favored the lesser verdict would Mr. Brooks have been in a position to shorten the trial by favoring such a verdict.

Perhaps most telling, the brevity of petitioner's trial—something that the prosecutor anticipated on the record during *voir dire*[1]—meant that serving on the jury would not have seriously interfered with Mr. Brooks' ability to complete his required student teaching. As noted, petitioner's trial was completed by Friday, August 30. If Mr. Brooks, who reported to court and was peremptorily challenged on Wednesday, August 28, had been permitted to serve, he would have missed only two additional days of student teaching, Thursday, August 29, and Friday, Au-

————————
[1] See, *e.g.,* App. 98, 105, 111, 121, 130, 204.

gust 30.  Mr. Brooks' dean promised to "work with" Mr.
Brooks to see that he was able to make up any student-
teaching time that he missed due to jury service; the dean
stated that he did not think that this would be a problem;
and the record contains no suggestion that Mr. Brooks
remained troubled after hearing the report of the dean's
remarks.  In addition, although the record does not in-
clude the academic calendar of Mr. Brooks' university, it is
apparent that the trial occurred relatively early in the fall
semester.  With many weeks remaining in the term, Mr.
Brooks would have needed to make up no more than an
hour or two per week in order to compensate for the time
that he would have lost due to jury service.  When all of
these considerations are taken into account, the prosecu-
tor's second proffered justification for striking Mr. Brooks
is suspicious.

The implausibility of this explanation is reinforced by
the prosecutor's acceptance of white jurors who disclosed
conflicting obligations that appear to have been at least as
serious as Mr. Brooks'.  We recognize that a retrospective
comparison of jurors based on a cold appellate record may
be very misleading when alleged similarities were not
raised at trial.  In that situation, an appellate court must
be mindful that an exploration of the alleged similarities
at the time of trial might have shown that the jurors in
question were not really comparable.  In this case, how-
ever, the shared characteristic, *i.e.*, concern about serving
on the jury due to conflicting obligations, was thoroughly
explored by the trial court when the relevant jurors asked
to be excused for cause.[2]

A comparison between Mr. Brooks and Roland Laws, a

_____

[2] The Louisiana Supreme Court did not hold that petitioner had pro-
cedurally defaulted reliance on a comparison of the African-American
jurors whom the prosecution struck with white jurors whom the prose-
cution accepted.  On the contrary, the State Supreme Court itself made
such a comparison.  See 942 So. 2d 484, 495–496 (2006).

white juror, is particularly striking. During the initial stage of *voir dire*, Mr. Laws approached the court and offered strong reasons why serving on the sequestered jury would cause him hardship. Mr. Laws stated that he was "a self-employed general contractor," with "two houses that are nearing completion, one [with the occupants] . . . moving in this weekend." *Id.*, at 129. He explained that, if he served on the jury, "the people won't [be able to] move in." *Id.*, at 130. Mr. Laws also had demanding family obligations:

> "[M]y wife just had a hysterectomy, so I'm running the kids back and forth to school, and we're not originally from here, so I have no family in the area, so between the two things, it's kind of bad timing for me." *Ibid.*

Although these obligations seem substantially more pressing than Mr. Brooks', the prosecution questioned Mr. Laws and attempted to elicit assurances that he would be able to serve despite his work and family obligations. See *ibid.* (prosecutor asking Mr. Laws "[i]f you got stuck on jury duty anyway . . . would you try to make other arrangements as best you could?"). And the prosecution declined the opportunity to use a peremptory strike on Mr. Laws. *Id.*, at 549. If the prosecution had been sincerely concerned that Mr. Brooks would favor a lesser verdict than first-degree murder in order to shorten the trial, it is hard to see why the prosecution would not have had at least as much concern regarding Mr. Laws.

The situation regarding another white juror, John Donnes, although less fully developed, is also significant. At the end of the first day of *voir dire*, Mr. Donnes approached the court and raised the possibility that he would have an important work commitment later that week. *Id.*, at 349. Because Mr. Donnes stated that he would know the next morning whether he would actually have a problem, the court suggested that Mr. Donnes raise

the matter again at that time. *Ibid.* The next day, Mr.
Donnes again expressed concern about serving, stating
that, in order to serve, "I'd have to cancel too many
things," including an urgent appointment at which his
presence was essential. *Id.,* at 467–468. Despite Mr.
Donnes' concern, the prosecution did not strike him. *Id.,*
at 490.

As previously noted, the question presented at the third
stage of the *Batson* inquiry is "'whether the defendant has
shown purposeful discrimination.'" *Miller-El* v. *Dretke*,
545 U. S., at 277. The prosecution's proffer of this pretex-
tual explanation naturally gives rise to an inference of
discriminatory intent. See *id.,* at 252 (noting the "pretex-
tual significance" of a "stated reason [that] does not hold
up"); *Purkett* v. *Elem*, 514 U. S. 765, 768 (1995) *(per cu-
riam)* ("At [the third] stage, implausible or fantastic justi-
fications may (and probably will) be found to be pretexts
for purposeful discrimination"); *Hernandez*, 500 U. S., at
365 (plurality opinion) ("In the typical peremptory chal-
lenge inquiry, the decisive question will be whether coun-
sel's race-neutral explanation for a peremptory chal-
lenge should be believed"). Cf. *St. Mary's Honor Center* v.
*Hicks*, 509 U. S. 502, 511 (1993) ("[R]ejection of the de-
fendant's proffered [nondiscriminatory] reasons will *per-
mit* the trier of fact to infer the ultimate fact of intentional
discrimination").

In other circumstances, we have held that, once it is
shown that a discriminatory intent was a substantial or
motivating factor in an action taken by a state actor, the
burden shifts to the party defending the action to show
that this factor was not determinative. See *Hunter* v.
*Underwood*, 471 U. S. 222, 228 (1985). We have not previ-
ously applied this rule in a *Batson* case, and we need not
decide here whether that standard governs in this context.
For present purposes, it is enough to recognize that a
peremptory strike shown to have been motivated in sub-

stantial part by discriminatory intent could not be sustained based on any lesser showing by the prosecution. And in light of the circumstances here—including absence of anything in the record showing that the trial judge credited the claim that Mr. Brooks was nervous, the prosecution's description of both of its proffered explanations as "main concern[s]," App. 444, and the adverse inference noted above—the record does not show that the prosecution would have pre-emptively challenged Mr. Brooks based on his nervousness alone. See *Hunter, supra*, at 228. Nor is there any realistic possibility that this subtle question of causation could be profitably explored further on remand at this late date, more than a decade after petitioner's trial.

*    *    *

We therefore reverse the judgment of the Louisiana Supreme Court and remand the case for further proceedings not inconsistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

No. 06–10119

ALLEN SNYDER, PETITIONER *v.* LOUISIANA

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
LOUISIANA

[March 19, 2008]

JUSTICE THOMAS, with whom JUSTICE SCALIA joins,
dissenting.

Petitioner essentially asks this Court to second-guess
the fact-based determinations of the Louisiana courts as to
the reasons for a prosecutor's decision to strike two jurors.
The evaluation of a prosecutor's motives for striking a
juror is at bottom a credibility judgment, which lies "ʻpe-
culiarly within a trial judge's province.ʼ" *Hernandez* v.
*New York*, 500 U. S. 352, 365 (1991) (plurality opinion)
(quoting *Wainwright* v. *Witt*, 469 U. S. 412, 428 (1985));
*Hernandez, supra,* at 372 (O'Connor, J., concurring in
judgment); *ante,* at 4. "[I]n the absence of exceptional
circumstances, we [should] defer to state-court factual
findings." *Hernandez*, 500 U. S., at 366. None of the
evidence in the record as to jurors Jeffrey Brooks and
Elaine Scott demonstrates that the trial court clearly
erred in finding they were not stricken on the basis of
race. Because the trial court's determination was a "per-
missible view of the evidence," *id.,* at 369, I would affirm
the judgment of the Louisiana Supreme Court.

The Court begins by setting out the "deferential stan-
dard," *ante,* at 7, that we apply to a trial court's resolution
of a *Batson* v. *Kentucky*, 476 U. S. 79 (1986), claim, noting
that we will overturn a ruling on the question of discrimi-
natory intent only if it is "clearly erroneous," *ante,* at 4.
Under this standard, we "will not reverse a lower court's

finding of fact simply because we would have decided the case differently." *Easley* v. *Cromartie*, 532 U. S. 234, 242 (2001) (internal quotation marks omitted). Instead, a reviewing court must ask "whether, 'on the entire evidence,' it is 'left with the definite and firm conviction that a mistake has been committed.'" *Ibid.* (quoting *United States* v. *United States Gypsum Co.*, 333 U. S. 364, 395 (1948)).

The Court acknowledges two reasons why a trial court "has a pivotal role in evaluating *Batson* claims." *Ante*, at 4. First, the Court notes that the trial court is uniquely situated to judge the prosecutor's credibility because the best evidence of discriminatory intent "'often will be the demeanor of the attorney who exercises the challenge.'" *Ibid.* (quoting *Hernandez*, *supra,* at 365 (plurality opinion)). Second, it recognizes that the trial court's "firsthand observations" of the juror's demeanor are of "grea[t] importance" in determining whether the prosecutor's neutral basis for the strike is credible. *Ante*, at 4.

The Court's conclusion, however, reveals that it is only paying lipservice to the pivotal role of the trial court. The Court second-guesses the trial court's determinations in this case merely because the judge did not clarify which of the prosecutor's neutral bases for striking Mr. Brooks was dispositive. But we have never suggested that a reviewing court should defer to a trial court's resolution of a *Batson* challenge only if the trial court made specific findings with respect to each of the prosecutor's proffered race-neutral reasons. To the contrary, when the grounds for a trial court's decision are ambiguous, an appellate court should not presume that the lower court based its decision on an improper ground, particularly when applying a deferential standard of review. See *Sprint/United Management Co.* v. *Mendelsohn*, *ante*, at ___ (slip op., at 6–7).

The prosecution offered two neutral bases for striking Mr. Brooks: his nervous demeanor and his stated concern

about missing class. App. 444. The trial court, in reject-ing defendant's *Batson* challenge, stated only "All right. I'm going to allow the challenge. I'm going to allow the challenge." *Id.,* at 445. The Court concedes that "the record does not show" whether the trial court made its determination based on Mr. Brooks' demeanor or his concern for missing class, *ante,* at 6, but then speculates as to what the trial court *might* have thought about Mr. Brooks' demeanor. As a result of that speculation, the Court concludes that it "cannot presume that the trial court credited the prosecutor's assertion that Mr. Brooks was nervous." *Ibid.* Inexplicably, however, the Court concludes that it *can* presume that the trial court imper-missibly relied on the prosecutor's supposedly pretextual concern about Mr. Brooks' teaching schedule, even though nothing in the record supports that interpretation over the one the Court rejects.

Indeed, if the record suggests anything, it is that the judge was more influenced by Mr. Brooks' nervousness than by his concern for missing class. Following an ex-change about whether his desire to get back to class would make Mr. Brooks more likely to support a verdict on a lesser included offense because it might avoid a penalty phase, defense counsel offered its primary rebuttal to the prosecutor's proffered neutral reasons. Immediately after argument on the nervousness point, the judge ruled on the *Batson* challenge, even interrupting the prosecutor to do so:

> "MR. VASQUEZ: His main problem yesterday was the fact that he didn't know if he would miss some teach-ing time as a student teacher. The clerk called the school and whoever it was and the Dean said that wouldn't be a problem. He was told that this would go through the weekend, and he expressed that that was his only concern, that he didn't have any other

problems.

   "As far as him looking nervous, hell, everybody out here looks nervous.  I'm nervous.
   "MR. OLINDE: Judge, it's —
   "MR. VASQUEZ: Judge, that's — You know.
   "MR. OLINDE: — a question of this: It's a peremptory challenge.  We need 12 out of 12 people.  Mr. Brooks was very uncertain and very nervous looking and —
   "THE COURT: All right.  I'm going to allow the challenge.  I'm going to allow the challenge."  App. 445.

Although this exchange is certainly not hard-and-fast evidence of the trial court's reasoning, it undermines the Court's presumption that the trial judge relied solely on Mr. Brooks' concern for missing school.

   The Court also concludes that the trial court's determination lacked support in the record because the prosecutor failed to strike two other jurors with similar concerns. *Ante*, at 10–12.  Those jurors, however, were never mentioned in the argument before the trial court, nor were they discussed in the filings or opinions on any of the three occasions this case was considered by the Louisiana Supreme Court.*  Petitioner failed to suggest a comparison with those two jurors in his petition for certiorari, and apparently only discovered this "clear error" in the record when drafting his brief before this Court.  We have no business overturning a conviction, years after the fact and after extensive intervening litigation, based on arguments not presented to the courts below.  Cf. *Miller-El* v. *Dretke*, 545 U. S. 231, 283 (2005) (THOMAS, J., dissenting).

———————

   *While the Court correctly observes that the Louisiana Supreme Court made a comparison between Mr. Brooks and unstricken white jurors, that is true only as to jurors Vicki Chauffe, Michael Sandras, and Arthur Yeager.  1998–1078 (La. 9/6/06), 942 So. 2d 484, 495–496.  The Court, on the other hand, focuses on Roland Laws and John Donnes, who were never discussed below in this context.

Because I believe that the trial court did not clearly err in rejecting petitioner's *Batson* challenge with respect to Mr. Brooks, I also must address the strike of Ms. Scott. The prosecution's neutral explanation for striking Ms. Scott was that she was unsure about her ability to impose the death penalty. Like the claims made about Mr. Brooks, there is very little in the record either to support or to undermine the prosecution's asserted rationale for striking Ms. Scott. But the trial court had the benefit of observing the exchange between the prosecutor and Ms. Scott, and accordingly was in the best position to judge whether the prosecutor's assessment of her response was credible. When asked if she could consider the death penalty, her first response was inaudible. App. 360. The trial court, with the benefit of contextual clues not apparent on a cold transcript, was better positioned to evaluate whether Ms. Scott was merely softspoken or seemed hesitant in her responses. Similarly, a firsthand observation of demeanor is the only thing that could give sufficient content to Ms. Scott's ultimate response—"I think I could," *id.,* at 361—to determine whether the prosecution's concern about her willingness to impose the death penalty was well founded. Given the trial court's expertise in making credibility determinations and its firsthand knowledge of the *voir dire* exchanges, it is entirely proper to defer to its judgment. Accordingly, I would affirm the judgment below.