Flanders JORDAN, Petitioner–Appellant,

v.

Eugene S. LEFEVRE, Respondent–Appellee.

Docket No. 01–2252.

United States Court of Appeals, Second Circuit.

Argued: Dec. 17, 2001.

Decided: March 27, 2002.

Randall D. Unger, Kew Gardens, New York, for Petitioner–Appellant.

Morrie I. Kleinbart, Assistant District Attorney, New York, NY (Robert M. Morgenthau, District Attorney, Mark Dwyer, Assistant District Attorney, New York County, New York, NY, on the brief), for Respondent–Appellee.

Before: KEARSE, WINTER, and CALABRESI, Circuit Judges.

KEARSE, Circuit Judge.

This case, in which petitioner Flanders Jordan, a New York State ("State") prisoner, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (1994 & Supp. II 1996) on the ground that he was denied equal protection at trial because the State used its peremptory challenges to strike several black prospective jurors, returns to us from the United States District Court for the Southern District of New York, Michael B. Mukasey, *Chief Judge,* following a remand for an evidentiary hearing on that claim or for the granting of the writ. *See Jordan v. Lefevre,* 206 F.3d 196 (2d Cir.2000) (*"Jordan II"*), *vacating in part* 22 F.Supp.2d 259 (S.D.N.Y.1998) (*"Jordan I"*). After an evidentiary hearing in accordance with *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), into the State prosecutor's state of mind at the time of jury selection, the district court found that the prosecutor had not discriminated on the basis of race, and it denied the petition. *See Jordan v. Lefevre,* No. 97 CIV 7046, 2000 WL 1877039 (S.D.N.Y. Dec.27, 2000) (*"Jordan III"*). Jordan appeals, contending that no meaningful reconstruction of the record was possible due to the passage of time and that, on the record as reconstructed, the district court erred in finding that the peremptory challenges were not exercised on the basis of race. For the reasons that follow, we affirm.

## I. BACKGROUND

The factual background of Jordan's *Batson* claim was set forth in *Jordan I,* 22 F.Supp.2d 259, and *Jordan II,* 206 F.3d 196, familiarity with which is assumed.

### A. *The Ruling in* Jordan II

Briefly summarized, Jordan and a codefendant, accused of stabbing an acquaintance to death, were tried in state court on murder and weapons charges; Jordan was convicted of manslaughter in 1991. During jury selection, defense counsel objected to the prosecutor's use of peremptory challenges against several members of the ve-

nire and "showed a potentially discriminatory pattern in the peremptory strike[s] of three black panelists." *Jordan II*, 206 F.3d at 201. The district court rejected Jordan's *Batson* claim, noting that " 'great deference' " is "to be accorded to the trial judge's determination," *Jordan I*, 22 F.Supp.2d at 270 (quoting *Batson*, 476 U.S. at 98 n. 21, 106 S.Ct. 1712), and ruling that the trial judge had conducted a proper inquiry and that his finding that the prosecutor's reasons were race-neutral was not clearly erroneous, *see Jordan I*, 22 F.Supp.2d at 263.

This Court disagreed, observing that the trial court had acted summarily, without permitting the defense to create a record sufficient to allow a determination of whether the prosecutor's explanations were credible and nonpretextual. We noted that

> [i]n assessing a challenge under *Batson*, a trial court must (1) decide whether the defendant has made a *prima facie* showing that the prosecutor has exercised a peremptory strike on the basis of race; (2) if so, decide whether the prosecutor has satisfied the burden of coming forward with a race neutral explanation for striking the potential juror; and, if so, then must (3) make a determination whether the defendant has carried his burden of proving purposeful discrimination.

*Jordan II*, 206 F.3d at 200. We pointed out that "the third step of the *Batson* inquiry requires a trial judge to make 'an ultimate determination on the issue of discriminatory intent based on all the facts and circumstances,' " *id.* (quoting *United States v. Alvarado*, 923 F.2d 253, 256 (2d Cir.1991)), "determin[ing] the credibility of the proffered explanations," *Jordan II*, 206 F.3d at 200. *See also Barnes v. Anderson*, 202 F.3d 150, 156–57 (2d Cir.1999) (trial court should not reject a *Batson* objection without explicitly adjudicating the credibil-

ity of the race-neutral explanations proffered for the peremptory challenges).

We held in *Jordan II* that, after Jordan had made a prima facie showing that the prosecutor exercised his peremptories on the basis of race, the trial court had failed to satisfy *Batson's* third step. The court had given only perfunctory consideration to Jordan's *Batson* objection, summarily rejecting it without conducting "a meaningful inquiry into 'the decisive question [of] whether counsel's race-neutral explanation for a peremptory challenge should be believed.' " 206 F.3d at 201 (quoting *Hernandez v. New York*, 500 U.S. 352, 365, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (plurality opinion)). Accordingly, we

> direct[ed] the district court to, in its discretion, hold a hearing to reconstruct the prosecutor's state of mind at the time of jury selection, or if the passage of nine years since Jordan's trial and other circumstances should have made such a determination impossible or unsatisfactory, to order that the state grant Jordan a new trial. *See Tankleff v. Senkowski*, 135 F.3d 235, 250 (2d Cir. 1998).

*Jordan II*, 206 F.3d at 202.

### B. *The Proceedings on Remand*

Following *Jordan II*, the district court conducted a reconstruction hearing in October 2000 at which the transcript of the trial voir dire was introduced, and Barry Ginsberg, the prosecutor who tried the case, testified. Ginsberg testified that he had been an Assistant District Attorney ("ADA") from 1987 to 1994. He served from 1987 to 1991 in the Major Offense Career Criminal Program, and from 1991 to 1994 in the Labor Racketeering Unit, where he eventually became unit chief. He left the District Attorney's Office to enter private practice in 1994.

During his tenure as an ADA, Ginsberg commenced about 20–25 jury trials, 15–20 of which went to verdict. He stated that his philosophy of jury selection, derived from that of the District Attorney's Office, was to "find people of good common sense, people who get along with other people, discuss and exchange ideas with other people, maturity, people who are comfortable making important decisions." (Reconstruction Hearing Transcript ("Recon.Tr.") at 12.) Ginsberg testified that he had never considered race as a factor in exercising peremptory challenges in any of the jury trials he conducted.

In preparation for the reconstruction hearing, Ginsberg had reviewed the transcript of the Jordan trial voir dire and his own handwritten notes. He had little independent recollection of the voir dire, though he had some recollection of the case itself because it was his first homicide case that went to trial. He testified that he had not considered race in any way in deciding to exercise his peremptory challenges against any of the black prospective jurors at Jordan's trial. He also stated that the case had had no apparent racial undertones, as all of the key actors were black: the defendants, the victim, several witnesses—including the only identification witness—and an off-duty corrections officer who was involved in the apprehension of Jordan's codefendant. In short, Ginsberg stated, "[i]t was not a race case." (Recon.Tr.24.)

Ginsberg had used 13 of the State's 20 peremptory challenges; five of the 13 were against black venirepersons. Two black jurors were unchallenged and served on the petit jury. The challenged venirepersons in question were Messrs. Wilber Atkinson and Robert Taylor, and Mrs. Ken Beasley, Mrs. Joan Davis, and Mrs. Iris Chartrain. Although Ginsberg recalled that Taylor looked young and that Chartrain was an older woman in her sixties, he stated that he did not recall the appearance of any other challenged jurors. Nor did he recall the appearance of any jurors who served at the three-week trial. Because Ginsberg had little or no recollection as to the details of the voir dire, most of his testimony as to the reasons for his challenges consisted of his reading from the trial transcript.

During the voir dire, Ginsberg's challenges were first questioned by Jordan with respect to Beasley, Atkinson, and Taylor. In response, Ginsberg stated that

> Beasley is freshest in my mind. She's a young woman, she works part-time. When asked what she did the rest of the time, she watches TV, lives with her mother and has a brother in jail. She didn't seem to me to have the kind of maturity or life experience that would make her a good juror to sit on this particular case.

(State Court Trial Transcript ("Trial Tr.") at 45–46.) As for Atkinson, Ginsberg stated:

> He's the one who said he had a brother who was arrested in the Bronx and the police beat him up unfairly, as far as he knew, the police acted unfairly. There is a great number of police going to testify and although he said it wouldn't affect him, I don't want that kind of juror.

(Trial Tr. 46.) With respect to Taylor, Ginsberg stated that

> he was relatively young, worked as a computer operator who didn't have any supervisory-type of role and was single and had no kids and didn't seem to have the kind of life experience that I prefer in jurors.

(Trial Tr. 46.)

After giving these explanations, which the trial judge accepted, Ginsberg challenged Davis. When Jordan's codefendant

objected, Ginsberg gave this explanation, which the trial court also accepted:

> My concern about Mrs. Davis was the situation with her daughter who resigned from the Police Department under unknown and frankly, to me, somewhat mysterious circumstances and given the number of police officers testifying in this case, that causes me concern.

(Trial Tr. 63.) Finally, when Ginsberg thereafter challenged Chartrain, the trial judge *sua sponte* asked for an explanation, and Ginsberg stated:

> She seemed goofy to me. She does not know what her two kids do, live in the area, she doesn't seem to have it all, even though she was on a convicting jury yesterday.

(Trial Tr. 130.) The trial judge then stated for the record that "Mrs. Cha[r]train appears to be a woman perhaps in her sixties, somewhat—she did indicate lack of contact with members of her family, and I wa[s] struck that while a very charming woman, she did not appear to be greatly intelligent. I will find there is a basis for the challenge." (*Id.*)

At the reconstruction hearing, Ginsberg was questioned as to his different treatment of seemingly similar prospective jurors, to wit, (1) Taylor, a black man who was peremptorily challenged by Ginsberg, and Catherine Timkin, a white woman who was not (Timkin was eventually challenged by the defense), and (2) Atkinson, a black man who was peremptorily challenged by Ginsberg, and Jane Schmidt, a white woman who was not. Explaining his decisions with respect to Taylor and Timkin, both of whom were single, had no children, and had jobs without supervisory responsibility, Ginsberg stated:

> One of the things—one of the things we're talking about life experience, one of the things you look for, I would look for in jurors is someone who gets along with other people, listens to other people, be persuaded and persuade other people.
>
> And one of the things that came out during the voir dire of Timkin was that she lived with her sister, unlike Taylor. She didn't live alone. And I think she had recently moved to accommodate being closer to her sister's job which would indicate the kind of give and take, back and forth, and the way she spoke.
>
> She spoke in complete sentences rather than just short one or two-word answers to questions. So, it seemed like someone who when she got in the jury room was going to be better suited for the deliberation process.

(Recon. Tr. 22; *see also* Recon. Tr. 41, 46–50.)

Explaining his different treatments of Atkinson and Schmidt, both of whom had brothers who had been arrested, Ginsberg noted that Atkinson said his brother had been treated unfairly by the police and seemed to have some animosity toward the police. In contrast, Ginsberg said, Schmidt, whose brother was a drug addict, had credited the police with saving her brother's life. (Recon Tr. 34–36, 44–45, 51–52.)

In a written opinion following the reconstruction hearing, the district court found (a) that in this case it was possible, even nine years after jury selection, to determine what had motivated Ginsberg to exercise the disputed challenges, and (b) that Ginsberg did not exercise the challenges on the basis of race. *Jordan III*, 2000 WL 1877039, at *1. As to the time lapse between the state trial and the reconstruction hearing, the court noted that "although Ginsberg's recollection at the hearing of his reasons for exercising those challenges was based principally on the transcript of the voir dire, it was not entirely so based." *Id.* at *4. Specifically,

"Ginsberg had a strong present recollection of the circumstances surrounding the trial and of the issues at trial, which are important in evaluating his motivation at the time." *Id.* As to the merits, the court found that the case itself provided no motivation for Ginsberg to exercise challenges on the basis of race. It also noted that two black jurors, including the foreperson, remained on the jury even though Ginsberg had seven peremptory challenges that went unused. The court concluded:

> The above factors, coupled with the race-neutral explanations Ginsberg had provided for each of his challenges, all of which I find to have been credible, convince me both that it is possible to determine now Ginsberg's motivation in exercising his challenges at trial, and that race was not a part of that motivation.

*Id.* Thus, the court denied Jordan's petition.

## II. DISCUSSION

On appeal, Jordan contends principally (1) that the district court should have concluded that a reconstruction hearing was not feasible because Ginsberg could not realistically be expected to have any recollection of a voir dire conducted nine years earlier and because in fact Ginsberg had no independent recollection of the voir dire; and (2) that the court erred in finding that the State's exercise of peremptories against black venirepersons was in no way motivated by race. Finding no error, we affirm.

■■ When, as here, the petitioner has made a prima facie showing of discriminatory use of peremptory challenges, "[t]he prosecutor ... must articulate a neutral explanation related to the particular case to be tried," *Batson*, 476 U.S. at 98, 106 S.Ct. 1712. The initial task of assessing the prosecutor's explanations falls to the judicial officer conducting the jury selection. *See, e.g., id.; United States v. Alvarado*, 923 F.2d at 256 (findings in federal prosecution should have been made by the magistrate judge who conducted the voir dire). A finding as to " 'intentional discrimination is a finding of fact' entitled to appropriate deference by a reviewing court," and "[s]ince the trial judge's findings in th[is] context ... largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference." *Batson*, 476 U.S. at 98 n. 21, 106 S.Ct. 1712 (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)).

■■ When the *Batson* claim is asserted by a state prisoner petitioning for habeas corpus in federal court, if the state court has not performed this task adequately, the responsibility for assessing the prosecutor's credibility and determining his intent falls on the district judge. *See, e.g., Jordan II*, 206 F.3d at 202. We have noted that there may be cases in which so many years have elapsed since the time of trial that the court cannot make "a reasoned determination of the prosecutor's state of mind when the jury was selected." *Brown v. Kelly*, 973 F.2d 116, 121 (2d Cir.1992) (where that ability is "demonstrably" impaired, "there must be a new trial"), *cert. denied*, 506 U.S. 1084, 113 S.Ct. 1060, 122 L.Ed.2d 366 (1993). The determination of whether the passage of time has foreclosed a reasoned reconstruction is, in the first instance, a matter for the court that attempts the reconstruction, for that court will have before it not only the trial record, but also the parties whose recollections and explanations are to be explored. *See generally Jordan II*, 206 F.3d at 202; *Bryant v. Speckard*, 131 F.3d 1076, 1077–78 (2d Cir.1997) (per curiam) (reversing district court's ruling that reconstruction, performed by a state judge

other than the trial judge, was not possible 6½ years after jury selection), *cert. denied*, 524 U.S. 907, 118 S.Ct. 2066, 141 L.Ed.2d 143 (1998); *Brown v. Kelly*, 973 F.2d at 121–22 (upholding finding that reconstruction by the district court was feasible more than six years after jury selection). We view the reconstructing court's assessment of the feasibility of reconstruction as entitled to substantial deference, assuming that there is no evidence casting doubt on that court's ability to make reasoned findings as to the prosecutor's intent. *See, e.g., Jordan II*, 206 F.3d at 202.

■ Once reconstruction has been determined to be feasible, we will accord deference to the reconstructing court's credibility assessments. When the reconstruction hearing has been conducted by the district judge, his findings of fact may not be set aside unless they are clearly erroneous. *See* Fed.R.Civ.P. 52(a) ("clearly erroneous" standard applies to findings in civil cases); Fed.R.Civ.P. 81(a)(2) ("These rules are applicable to proceedings for … habeas corpus … to the extent that the practice in such proceedings is not set forth in statutes of the United States and has heretofore conformed to the practice in civil actions."); *see, e.g., Wade v. Mayo*, 334 U.S. 672, 683–84, 68 S.Ct. 1270, 92 L.Ed. 1647 (1948) (district judge's findings in a federal habeas proceeding may not be set aside unless they are clearly erroneous); *Brown v. Kelly*, 973 F.2d at 122. In reviewing the court's findings as to the prosecutor's intent, we note also that

> [a]n explanation for a particular challenge need not necessarily be pigeonholed as wholly acceptable or wholly unacceptable. The relative plausibility or implausibility of each explanation for a particular challenge, assessed in light of the prosecution's acceptance of jurors with similar circumstances, may strengthen or weaken the assessment of

the prosecution's explanation as to other challenges and thereby assist the factfinder in determining overall intent. Moreover, … the prosecution's decision not to use an available challenge against minority veniremen is also a relevant circumstance to be weighed.

*United States v. Alvarado*, 923 F.2d at 256.

■ In the present case, we see no basis for overturning any of the district court's findings. We decline Jordan's invitation to rule that the passage of nine years makes reconstruction of the record infeasible as a matter of law, and we defer to the district court's assessment that reconstruction was feasible here. That assessment was supported by the facts that Ginsberg had a recollection of the case itself because it was his first homicide case that went to trial, that he had notes made during the voir dire, and that he had contemporaneously given explanations for each of the challenges to which the defense objected. The court did not err in concluding that factual findings as to Ginsberg's motivation were possible despite the passage of time.

■ Nor do we see error in the district court's finding that Ginsberg's exercise of five of the State's peremptory challenges against blacks was not motivated by their race. Ginsberg offered race-neutral reasons for each of those challenges. It was not impermissible for the district court to credit his explanations that he viewed Atkinson as potentially having animosity toward the police because of Atkinson's view that the police had unfairly arrested and beaten his brother, and Davis as potentially having such animosity because of her daughter's unexplained resignation from the police department. Nor was it impermissible for the court to credit Ginsberg's assessments that Chartrain, who did not know the occupations or whereabouts of her children, lacked the common sense he

sought in a juror, and that Beasley, who lived with her mother, worked only part-time, and spent the rest of her time watching television, seemed to lack both maturity and experience in making important decisions. The court was also entitled to credit Ginsberg's differentiation between Taylor and Timkin on the bases that the latter seemed more articulate and, in light of her lifestyle decisions, more likely to be amenable to give-and-take in jury deliberations, and hence more likely to help the jury reach a reasoned verdict.

The district court's decision to credit Ginsberg's explanations and its finding that Ginsberg was not motivated by race were also supported by, *inter alia,* the court's ability to assess Ginsberg's demeanor as he testified to his general philosophy of jury selection and his denial that he had ever used race as a criterion for exercising peremptories, and by the facts that Jordan's case had no apparent racial undertones and that two blacks were seated on the jury without the State's using peremptory challenges that remained available to it. On this record, we cannot conclude that the district court's findings are clearly erroneous.

### CONCLUSION

We have considered all of Jordan's contentions on this appeal and have found in them no basis for reversal. The judgment of the district court is affirmed.